IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ALEX MARTIN, | ) | Case No. 3:18-CV-219 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFRY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Alex Martin, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g),1383(c)(3), and Local Rule 72.2(b). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II.     Procedural History

On October 5, 2011, Martin applied for disability insurance benefits and supplemental security income.  (Tr. 218–30).  Martin alleged that he became disabled on December 15, 2010, due to "sever[e] pain, constant severe pain in extrem[i]ties, chest pain occurring every few days, periods of numbness in limbs, spasms in extrem[i]ties resulting in falling/dropping items, back/neck pain and stiffness, trouble standing or walking for prolonged periods, experience

Lhermitte's sign,[1] short term memory problems, periodic tremors in hands/arthritis like symptoms, [and] twitching in the left side of [his] face."  (Tr. 62, 70, 80, 93, 218, 225).  The Social Security Administration denied Martin's applications initially and upon reconsideration.  (Tr. 62–77, 80–105).  Martin requested an ALJ hearing.  (Tr. 122).  Administrative Law Judge ("ALJ") Kim L. Bright heard Martin's case on March 5, 2014, and denied his claim in an August 28, 2014 decision.  (Tr. 7–61).  On September 24, 2015, the Appeals Council denied Martin's request for review.  (Tr. 1–3).

On November 18, 2015, Martin filed a complaint to seek judicial review of the Commissioner's decision.  N.D. Ohio Case No. 3:15-CV-2365, ECF Doc. 1.  On May 23, 2016, Martin and the Commissioner filed a "joint motion for remand," stating that:

> [u]pon remand, the Administrative Law Judge will: (1) further evaluate Plaintiff's fibromyalgia[2]; (2) evaluate the medical opinions of record; (3) evaluate Plaintiff's statements concerning the intensity and persistence of his complaints; and (4) offer the claimant the opportunity for a hearing, take further action to complete the administrative record resolving the above issues, and issue a new decision.

N.D. Ohio Case No. 3:15-CV-2365, ECF Doc. 17.  On May 31, 2016, U.S. Magistrate Judge George J. Limbert granted Martin and the Commissioner's joint motion, and remanded Martin's case to the SSA.  (Tr. 847).  The Appeals Counsel issued an order, stating that Martin's case was remanded to the ALJ because the ALJ: (1) did not sufficiently evaluate treating source opinions

---

[1] Lhermitte's sign is "[e]lectric shock sensations that occur with certain neck movements, especially bending the neck forward."  *Multiple Sclerosis*, MAYO FOUND. FOR MED. EDUC. AND RES., https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269?p=1 (last visited Nov. 1, 2018).  Lhermitte's sign is a characteristic symptom of multiple sclerosis (an autoimmune disease that causes nerve deterioration and communications issues between the brain and the rest of the body).  *Id.*

[2] "Fibromyalgia is a condition in which a person has long-term pain that is spread throughout the body.  The pain is most often linked to fatigue, sleep problems, headaches, depression, and anxiety.  People with fibromyalgia may also have tenderness in the joints, muscles, tendons, and other soft tissue."  *Fibromyalgia*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/ article/000427.htm (last visited Nov. 1, 2018).

from Jonathan E. Rohrs, M.D, and Van Warren, M.D., in light of all the evidence in the record; (2) did not account for the full scope of Martin's limited daily activities; and (3) did not properly evaluate Martin's fibromyalgia complaints under SSR 12-2p, 77 Fed. Reg. 43640 (July 25, 2012) (Evaluation of Fibromyalgia).  (Tr. 853–55).  ALJ Richard Horowitz heard Martin's case on November 3, 2016, and denied his claim in a December 23, 2016, decision.  (Tr. 741–821).  On December 1, 2017, the Appeals Council denied Martin's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 721–27).  On January 29, 2018, Martin filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Martin was born on April 28, 1984, and was 26 years old on the alleged onset date. (Tr. 218, 225).  Martin had a bachelor's degree in biology, with a minor in chemistry.  (Tr. 775). He had prior work experience as a retail clerk, department manager, and meat cutter.  (Tr. 19, 753, 776).

### B.    Relevant Medical Evidence

In September 2008, Martin had a neurocardiogenic syncope[3] while operating a meat slicer at work, and severely cut his thumb.  (Tr. 585, 588).  He told the emergency room doctor that he was "very leery about returning to any type of job that involve[d] saws."  (Tr. 588).

On June 10, 2010, Martin saw. Jonathan Rohrs, M.D., and physician's assistant ("PA") Joel Wilson for treatment of his back pain.  (Tr. 652).  Dr. Rohrs and PA Wilson noted that bending, turning and pressure made Martin's pain worse.  (*Id.*).  On examination, Dr. Rohrs and PA Wilson noted that Martin had lower back spasms, and possible nerve conduction issues.

---

[3] Syncope (feinting) is the "loss of consciousness resulting from insufficient blood flow to the brain." *Syncope*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/syncope (last visited Nov. 1, 2018).

(*Id.*). Dr. Rohrs prescribed a pain reliever. (*Id.*). At a follow-up on June 23, 2010, Martin added that he had chest pain and fatigue, but that his back was "80% better" and had "a lot less spasming." (Tr. 653). On August 3, 2010, Martin also reported that he had severe headaches, vomiting, and visual disturbances. (Tr. 654). On December 10, 2010, Dr. Rohrs and PA Wilson noted that Martin had tender muscles along his upper spine, a tender chest wall, costochondritis,[4] chest wall spasms, upper spine spasms, and right arm pain. (Tr. 433). On December 28, 2010, PA Wilson added that Martin had neck pain, neuropathy,[5] and paresthesias,[6] but he did not change the course of treatment. (Tr. 431).

On December 7, 2010, Martin was admitted to the emergency room for "constant pain in the mid chest and also some pain in the right arm." (Tr. 371, 381–82). He rated his pain as a 5/10, and he had no tenderness in his abdomen or extremities on examination. (Tr. 382). There was no evidence of any significant changes or acute issues, except that one out of three tests revealed elevated troponin[7] levels. (Tr. 369, 371, 416–17). Dr. Rohrs continued Martin's medication and recommended that Martin diet and exercise. (Tr. 369).

On December 13, 2010, Rubina Shah, M.D., took x-rays of Martin's spine and found satisfactory alignment, preserved disc spaces, and unremarkable tissues between the head and

---

[4] Costochondritis is inflammation of cartilage in the breast, and it is a common cause of chest pain. *Costochondritis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000164.htm (last visited Nov. 1, 2018).
[5] Neuropathy is "damage, disease, or dysfunction of one or more nerves . . . typically marked by burning or shooting pain, numbness, tingling, or muscle weakness or atrophy." *Neuropathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/neuropathy (last visited Nov. 1, 2018).
[6] Paresthesias are abnormal numbness and tingling sensations. *Numbness and Tingling*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/003206.htm (last visited Nov. 1, 2018).
[7] Troponin is a protein released when the heart muscle is damaged, such as during a heart attack. *Troponin Test*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/007452.htm (last visited Nov. 1, 2018).

spine.  (Tr. 367).  Dr. Shah noted that there was a "loss of lordosis,[8] which may be due to spasm

or pain."  (*Id.*).  Dr. Shah again stated that the findings were unremarkable after reviewing

similar x-rays again in June 2013.  (Tr. 618–19).

In January, March, June, July, September, October, and November 2011, Dr. Rohrs and

PA Wilson did not note any significant changes in their clinical findings and continued treating

Martin's pain symptoms with medication.  (Tr. 422, 426–30, 559, 561, 563, 608–10).  On

October 31, 2011, Dr. Rohrs and Wilson noted that Martin's physical, sensory, and cognitive

functions were all normal; they diagnosed Martin with polyneuropathy, muscle spasms,

extremity pain, and high blood pressure; and they continued Martin's medications.  (Tr. 426,

561).  In a related treatment questionnaire, Martin noted that his medications helped.  (Tr. 424,

560).  In January, May, and July 2012, Dr. Rohrs and PA Wilson did not note any significant

changes in their clinical findings and continued treating Martin's pain symptoms with

medication.  (Tr. 549, 551, 553, 555, 557).

On January 4, 2011, Martin saw Craig Platenberg, M.D., for spinal imaging, and

Dr. Platenberg determined that there were no remarkable issues with Martin's spine.  (Tr. 655).

On January 20, 2011, Martin saw James Sander, M.D., for a neurologic consultation. (Tr.

603).  On examination, Dr. Sander noted that Martin had normal speech and language, normal

nerve functions, full strength in his arms and legs, and decreased sensory loss in his right arm.

(*Id*).  On January 25, 2011, Dr. Sander noted that Martin did not have any signs of neuropathy in

his arms, except that Martin's study was "abnormal for evidence for an absent lateral

---

[8] "Lordosis is excessive curvature in the [lower] portion of the spine, which gives a swayback appearance."  *Lordosis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/imagepages/9583.htm (last visited Nov. 1, 2018).

antebrachial cutaneous nerve."[9]  (Tr. 607).  Dr. Sander also noted that there was no clear

radiculopathy, and that any chronic denervation in Martin's forearm was mild to moderate.  (*Id.*).

On May 26, 2011, Allan Kaufman, M.D., conducted a CT scan of Martin's spine to

investigate his complaints of neck and back pain.  (Tr. 506, 537).  Dr. Kaufman determined that

Martin's spine appeared normal.  (*Id.*).  Dr. Kaufman then conducted a scan of Martin's lower

back and lumbar puncture, but again found no abnormalities in Martin's spine.  (Tr. 507–09,

534–36).  Martin went to the emergency room on May 29, 2011, for a headache related to his

lumbar puncture, and requested blood patch treatment.  (Tr. 501–04, 529–32).  Nurse Barb Steck

noted that Martin refused treatment when he was offered caffeine and an IV, and Martin left the

emergency room without signing the discharge papers.  (*Id.*).

On June 8, 2011, Martin saw Michael Walsh, M.D., for an MRI on referral from

Dr. Rohrs.  (Tr. 492–93, 520–21).  Dr. Walsh determined that there was no evidence of acute

intracranial process, or any clinically significant abnormalities.  (*Id.*).

On December 15, 2011, Martin saw Daniel Dessner, M.D., for an MRI on referral from

Dr. Rohrs.  (Tr. 490, 519).  Dr. Dessner noted that Martin's pain and weakness in his upper and

lower extremities had worsened over the prior six months; but no clinically significant

abnormalities were noted on examination.  (*Id.*).

On January 20, 2012, Bashar Katirji, M.D., and Numthip Chitravas, M.D., performed a

nerve conduction study on Martin, and determined that his nerve function was normal and that

there was no evidence of radiculopathy[10] or lower neck neuropathy.  (Tr. 443).  Dr. Katirji

---

[9] The lateral antebrachial cutaneous nerve is the nerve servicing the upper forearm.  *See Lateral Brachial Cutaneous Nerve*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/cutaneous%20nerve (last visited Nov. 1, 2018); *Antebrachium*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/antebrachium (last visited Nov. 1, 2018).

[10] Radiculopathy is injury to a nerve root that typically causes pain, numbness, or weakness in the part of the body supplied with nerves from that nerve root.  *Radiculopathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/radiculopathy (last visited Nov. 1, 2018).

determined that Martin had bilateral arm pain, thoracic outlet syndrome,[11] and peripheral neuropathy.[12]  (Tr. 445).

On March 6, 2012, Martin went to St. Luke's Hospital emergency department due to a headache that worsened with standing.  (Tr. 480).  Dr. Asad noted that Martin had no neck stiffness, nausea, chest pain, or abdominal pain.  (*Id.*).  Martin also had normal tone, power, movement, and reflexes in his limbs.  (Tr. 481).  Dr. Asad noted that Martin's headache responded to pain medication, and that Martin refused admission to the hospital when offered.  (Tr. 482).  Dr. Asad prescribed an opioid pain reliever.  (*Id.*).

On April 30, 2012, Martin told Van Warren, M.D., that pain and numbness had spread from his hands to both arms and legs within a few months.  (Tr. 464).  Martin told Dr. Warren that he had headaches, dry eyes, a dry mouth, nausea, and lightheadedness.  (*Id.*).  Dr. Warren noted that there was no significant muscle weakness; his neck was unremarkable; his lungs, heart, abdomen, and extremities were benign; he had no joint swelling; he had good range of motion; and his chest and spine were normal.  (Tr. 464–65).  Dr. Warren determined that Martin's muscle pain and paresthesia, along with "unremarkable investigations for etiologies of neuropathic symptoms and apparently abnormal . . . nerve conduction," could indicate fibromyalgia and occult connective tissue disorder.[13]  (Tr. 465).

---

[11] Thoracic outlet syndrome is a rare condition involving pain in the neck and shoulder, numbness and tingling in the fingers, and a weak grip.  *Thoracic Outlet Syndrome*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/001434.htm (last visited Nov. 1, 2018).

[12] Peripheral neuropathy is the dysfunction of nerves throughout the whole body, and may occur due to damage to one nerve or a group of nerves.  *Peripheral Neuropathy*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000593.htm (last visited Nov. 1, 2018).

[13] An occult connective tissue disorder is a difficult to detect, or not easily understood, problem affecting the connective tissues that support other parts of the body.  *See Connective Tissue Disorders*, U.S. NAT'L LIBRARY OF MED. (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/connectivetissuedisorders.html#summary (last visited Nov. 1, 2018); *Occult*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/occult (last visited Nov. 1, 2018).

On September 27, 2012, Martin saw psychologist J. Bruce Kelly, M.Ed., for a consultative examination. (Tr. 565–73). Kelly noted, among other things, that Martin drove himself to his appointment, appeared well-groomed, and did not require assistance to complete a pre-assessment questionnaire, and did not express any fears regarding any specific illnesses or bodily limitations. (Tr. 568–70). Martin told Kelly that, in a typical day, he would wake up at 8 am, shower, have breakfast, take his dog for a walk around the block, have lunch, run errands, read, watch television, eat dinner, and go to sleep by 11 pm. (Tr. 570). Martin indicated that he did laundry, cooked, played chess with a friend, and read. (Tr. 570–71).

On November 9, 2012, Dr. Rohrs and PA Wilson determined that Martin had fibromyalgia. (Tr. 657). In January, April July, September, and December 2013, and January 2014, Dr. Rohrs continued Martin's course of treatment through medications and did not note any significant changes to Martin's condition on examination. (Tr. 549, 658–59, 662–67).

On December 2, 2013, Martin saw Ayesha Kanwai, M.D., and Dr. Warren because he had "pain all over." (Tr. 614). Martin told his doctors that his worst pain was in his knees, wrists, back, and shoulders; his face twitched and had tremors; and he unintentionally moved his arms. (*Id.*). The doctors determined that Martin had polyarthralgia,[14] tremors, and neuropathy. (Tr. 616). They also ordered more testing to determine whether Martin had small fiber neuropathy, multiple sclerosis, or Parkinson's. (*Id.*).

On December 31, 2013, Martin saw neurologist Lawrence Elmer, M.D., on referral from Dr. Warren. (Tr. 625–30). Martin told Dr. Elmer that he had fatigue, heart palpitations, neck pain, back pain, muscle pain, muscle pain, lightheadedness, weakness, numbness, tremors, and difficulty sleeping. (Tr. 627–28). He also told Dr. Elmer that he exercised five or more days per

---

[14] Polyarthralgia is pain in multiple joints. *See Arthralgia*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/arthralgias (last visited Nov. 1, 2018).

week. (Tr. 627). On examination, Dr. Elmer noted that Martin's heart rate and rhythm were normal, and there were no noted issues with Martin's mental status, cranial nerve function, motor function, coordination, or walking. (Tr. 628–29). Dr. Elmer noted that Martin's sensation was symmetrical, he had diminished sensation on his extremities, and his temperature sensation was normal. (Tr. 629). Dr. Elmer noted that Martin had "a known diagnosis of fibromyalgia", but he could not "make a conclusive diagnosis that would explain all his symptoms." (Tr. 625, 629). He noted that Martin's reported muscle twitching was benign, and that Martin's migraine treatment helped his symptoms. (*Id.*).

On March 3, 2014, Martin saw Dr. Warren for treatment of his migraines, pain in both hands and wrists, and back and neck stiffness. (Tr. 1222). On examination, Dr. Warren determined that Martin had some tenderness in his upper and lower back, arms, wrists, knees, and ankles. (Tr. 1224). He noted that Martin had pain in his hips and generalized stiffness, with limitations in his lower spine range of motion. (*Id.*). He noted that Martin had fibromyalgia, and diagnosed him with ankylosia[15] of the spine and migraine headaches. (*Id.*). Dr. Warren continued Martin's medication and recommended that he exercise and follow up with a neurologist. (*Id.*). On August 29, 2014, Dr. Warren noted that Martin had a mildly limited range of motion in his upper spine, continued Martin's medications, and continued plans for Martin to get neurology, cardiology, and dermatology evaluations. (Tr. 1227). On April 3, 2015, Dr. Warren noted that Martin spontaneously fell twice since his last visit, and diagnosed him with gait disorder. (Tr. 1228, 1230). Dr. Warren noted that Martin had good range of motion in his upper spine, pain in his knees without joint swelling, and tenderness in his back muscles. (Tr. 1230). He noted that Martin's ankylosis was improving and prescribed Martin additional

---

[15] Ankylosis is stiffness or fixation of a joint, such as when two separate bones join to form a single bone. *Ankylosis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ankylosis (last visited Nov. 1, 2018).

medicines.  (Tr. 1231).  On July 24, 2015, Martin told Dr. Warren that he had nausea in the mornings, numbness and tingling in his hands and legs, back pain, headaches, lightheadedness, and jitteriness.  (Tr. 1232).  Dr. Warren continued Martin's pain management plan and medications.  (Tr. 1235).

On July 27, 2015, Martin began treating with Lawrence Monger, M.D., for treatment of his various symptoms.  (Tr. 1212–20).  Dr. Monger noted that Martin had a history of syncope, migraines, nerve entrapment, and fibromyalgia.  (Tr. 1214, 1218).  Martin told Dr. Monger that he did not have any fatigue, eye issues, nose or sinus problems, oral health issues, respiratory issues, chest pain, arm pain, abdominal pain, muscle aches or weakness, joint pain, back pain, swelling, neck pain, bon pain, headaches, lightheadedness, or syncope.  (Tr. 1214–15, 1218–19).  Dr. Monger did not note any physical examination, continued Martin's medications, and prescribed physical therapy to treat his fibromyalgia.  (Tr. 1215, 1219).  Dr. Monger also referred Martin to a cardiologist for further evaluation of Martin's neurocardiogenic syncope.  (Tr. 1215, 1219).  Martin saw Dr. Monger again on November 20, 2015, and Dr. Monger did not note any significant changes in Martin's condition or change Martin's treatment.  (Tr. 1147–55).  Dr. Monger noted, however, that Martin had not seen the cardiologist as referred, despite having seen several other specialists.  (Tr. 1150, 1154).

On July 29, 2015, Mark Buehler, M.D., took x-rays of Martin's spine after Martin reported neck pain, spasms, and pain radiating into his shoulders.  (Tr. 981).  Dr. Buehler determined that there were no acute abnormalities.  (*Id.*).

Also on July 29, 2015, Martin saw Tallat Rizk, M.D., to be evaluated for fibromyalgia.  (Tr. 1204–12).  Dr. Rizk noted that Martin had pain all over, but that it was worse in his neck, back, and shoulders.  (Tr. 1205, 1208).  Martin told Dr. Rizk that he had muscle aches, muscle weakness, joint pain, migraines, and sleep disturbances.  (Tr. 1207, 1211).  On examination,

Dr. Rizk noted that Martin had tenderness in his neck muscles; normal range of motion; full strength in his neck, arms, and fingers; and normal reflexes.  (Tr. 1207–08, 1211).  Dr. Rizk diagnosed Martin with neck pain and recommended physical therapy.  (Tr. 1208, 1211).  On August 12, 2015, October 7, 2015, and November 25, 2015, Dr. Rizk did not make any significant changes to his evaluation of Martin's condition or his treatment.  (Tr. 1140–47, 1155–64, 1190–97).  At a follow-up on January 20, 2016, Dr. Rizk gave Martin trigger-point injections, and noted that Martin tolerated the procedure well.  (Tr. 1116, 1121).  At a follow-up on March 23, 2016, Dr. Rizk noted that Martin's injection helped his back feel better, but made his neck feel worse, and he again gave Martin trigger-point injections.  (Tr. 1076, 1079, 1082–84).  Martin requested and received additional injections on June 17, 2016, and September 2, 2016.  (Tr. 1038, 1041–42, 1045).

On July 30, 2015, Martin saw A. Mustapha, M.D., for arm pain treatment.  (Tr. 1197–1204).  Dr. Mustapha noted that Martin had numbness, tingling, and grip weakness that had become worse over the prior 5 years, and that he had not tried any bracing or injections to help his condition.  (Tr. 1199, 1203).  On examination, Dr. Mustapha noted that Martin had decreased nerve distribution in his harms, and nerve compression in his wrists.  (Tr. 1200, 1203).  Dr. Mustapha diagnosed Martin with cubital tunnel syndrome and carpal tunnel syndrome and recommended that Martin use a splint and exercises to reduce his symptoms.  (Tr. 1200, 1204).

From August 4, 2015, through January 5, 2016, Martin saw Physical Therapist Caitlin Gibbons, to treat his back pain.  (Tr. 985–1024).  At discharge from physical therapy, Gibbons noted that Martin had attended 26 physical therapy sessions, and that his treatment included exercise, massage, and electrical stimulation.  (Tr. 985).  Gibbons noted that Martin did not achieve his range of motion goals, but he did achieve his strength goals.  (*Id.*).  She indicated that Martin did not reduce his pain, sleeping difficulties, or headache frequency, but that mechanical

cervical traction provided him the most relief. (*Id.*). Gibbons recommended that Martin purchase a home cervical traction unit and continue his exercises. (*Id.*).

On September 23, 2015, Martin saw Hongyan Li, M.D., Ph.D., and Dr. Rizk for a follow-up after his physical therapy. (Tr. 1180–1189). Martin told Dr. Li and Dr. Rizk that his physical therapy helped for a few hours, but that his pain came back. (Tr. 1181, 1185). Dr. Li and Dr. Rizk administered a nerve block injection and determined that Martin's pain was well-controlled. (Tr. 1184, 1188). Martin told Dr. Rizk that physical therapy "help[ed] about 10%," that he continued to have migraines, and that medications did not help. (Tr. 1187). In October, Martin told Dr. Rizk that his injection helped for a day, but then his pain returned. (Tr. 1156). At a follow-up in January 2016, Dr. Rizk noted that Martin responded well to water therapy, and he gave Martin an order to have a traction machine. (Tr. 1115).

On October 5, 2015, Dr. Li noted that Martin's head and neck were unremarkable, his heartbeat was regular, and there were no deformities in his extremities or spine. (Tr. 1168, 1177). Dr. Li noted that Martin had no mental status issues, his cranial nerve function was normal, and he had normal range of motion and strength. (Tr. 1169, 1177–78). Dr. Li did not note any deficits in Martin's reflexes, senses, or coordination, and she noted that Martin's ability to stand and walk was normal. (Tr. 1170, 1178). Dr. Li diagnosed Martin with migraines, syncope, fibromyalgia, and high blood pressure. (Tr. 1171, 1180). She prescribed Martin medications and instructed him on diet. (Tr. 1171–72, 1179–80). At a follow-up on January 25, 2016, Dr. Li noted that Martin's said his headaches continued and his muscle pain was worse. (Tr. 1097, 1106). Dr. Li did not note any abnormalities on examination, gave Martin additional diagnoses of tension-type headaches and sleep apnea, and continued Martin's course of treatment. (Tr. 1099–1103, 1108–12). At a follow-up on April 4, 2016, Dr. Li noted that Martin had a slight decrease in migraines due to his medication and injections from Dr. Rizk, but his muscle pain continued. (Tr. 1058,

1061, 1067, 1070). Dr. Li noted that Martin had full strength and range of motion on examination. (Tr. 1063–66, 1071–75).

On November 23, 2015, Dr. Warren noted that Martin had some improvement with his headaches from physical therapy, but that he did not report any significant improvement from nerve block injections or other medications. (Tr. 1236). Dr. Warren noted that Martin had good muscle strength in his arms, hands, hips, legs, and knees, and that he had a normal gait. (*Id.*). He noted that Martin's upper arms, thighs, and lower back were tender, and that he had fibromyalgia and spondyloarthropathy[16] that had not improved with physical therapy. (*Id.*). Dr. Warren changed Martin's medications and ordered additional lab tests. (*Id.*). At a visit on April 12, 2016, Dr. Warren did not note any significant changes in Martin's condition, and continued his treatment through medication. (Tr. 1240).

On November 30, 2015, Martin saw Dr. Monger for an examination and pain treatment. (Tr. 1131–40). On examination, Dr. Monger did not note any abnormalities in Martin's ability to walk, psychiatric health, head, vision, or neck. (Tr. 1134). Dr. Monger noted that Martin had jaw discomfort and ringing in his ears but made no significant changes to Martin's diagnoses or course of treatment. (Tr. 1135).

On January 12, 2016, Martin saw Dr. Rajesh Gupta, M.D., for evaluation of his neurocardiogenic syncope. (Tr. 1122). Dr. Gupta noted that Martin had his first syncope when he was 20 years old, and that he had three to four episodes per year. (Tr. 1124). Martin told Dr. Gupta that his symptoms were stable, and that he had migraines, muscle aches, and chronic dull chest pain, shortness of breath, palpitations, jaw pain, arm pain, neck pain, back pain, joint pain, lightheadedness, tremors, sleep issues, and fatigue. (Tr. 1124–25). On examination,

---

[16] Spondyloarthropathy is "any of several diseases (as ankylosing spondylitis) affecting the joints of the spine." *Spondyloarthropathy*, Merriam-Webster, https://www.merriam-webster.com/medical/spondyloarthropathy (last visited Nov. 1, 2018).

Dr. Gupta did not note any abnormalities in Martin's constitution, psychiatric health, neck, lungs, heart, abdomen, musculoskeletal system, and neurologic functions.  (Tr. 1125).  Dr. Gupta prescribed medications for Martin's syncope, and recommended that Martin "get better and find meaningful work."  (Tr. 1125).  At a follow-up on February 25, 2016, Dr. Gupta noted that Martin was doing okay on his syncope medications, and continued his medications for his other diagnoses.  (Tr. 1088–89, 1093–94).

On April 7, 2016, Martin saw Nurse Practitioner Beverly Karabin, Ph.D., for a follow-up with Martin's syncope, migraine, and high blood pressure.  (Tr. 1049–58).  On examination, NP Karabin did not note any abnormalities in Martin's heart, lungs, or extremities.  (Tr. 1052, 1057).  She continued Martin's course of treatment.  (Tr. 1052–53, 1057–58).  She noted that she "told [Martin] that he needs to get better and find meaningful work.  He is only 31 years old and cannot remain at home for years on disability."  (Tr. 1052–53).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician—Jonathan Rohrs, M.D.

On September 21, 2012, Dr. Rohrs completed a medical source statement, indicating that Martin was "unemployable."  (Tr. 581–82).  Dr. Rohrs stated that Martin had fibromyalgia, migraines, chronic pain, soft tissue pain, muscle spasms, and syncope. (Tr. 581).  Dr. Rohrs stated that Martin could: stand/walk for up to "1/4 hours" in an 8-hour workday without interruption; sit for up to 4 hours and "1/20 hours" without interruption in an 8-hour workday; and lift/carry up to 6 to 10 pounds frequently (up to "2/3 of an 8-hour workday).  (Tr. 582).  Further, Dr. Rohrs opined that Martin was markedly limited in handling; moderately limited in pushing/pulling, bending, reaching, and repetitive foot movements; not significantly limited in seeing and speaking; and unlimited in hearing.  (*Id.*).  Dr. Rohrs wrote that Martin's disability would last 6 months, and circled "permanent disability" on the form.  (*Id.*).

Sixteen months later, on January 28, 2014, Dr. Rohrs completed another medical source statement, indicating that Martin would be unemployable for 10 months.  (Tr. 668–69).  Dr. Rohrs stated that Martin had fibromyalgia, migraine, chronic pain, soft tissue pain, muscle spasms, syncope, and insomnia, and that his health status was "poor but stable."  (Tr. 668).  Dr. Rohrs opined that Martin could walk for "1/2 hours" in an 8-hour workday; sit for "2–3 hours" in an 8-hour workday; and frequently lift 5–10 pounds.  (Tr. 669).  Dr. Rohrs also indicated that Martin was "markedly limited" in pushing/pulling, bending, reaching, handling, and repetitive foot movements; and "not significantly" limited in seeing, hearing, and speaking.  (*Id.*).

### 2.      Treating Physician—Van Warren, M.D.

On February 11, 2014, Dr. Van Warren completed a form medical source statement for fibromyalgia.  (Tr. 670–73).  Dr. Warren stated that Martin had limited flexion in his lumbar spine; involuntary twitching in his face and arms; tender points in his knees, shoulders, lower back, hips, and wrists; and pain in his lower spine, both shoulders, and both hands/fingers. (Tr. 670–71).  He stated that movement, overuse, and static positioning made Martin's pain worse.  (*Id.*).  Dr. Warren opined that Martin could occasionally lift up to 10 pounds, look down, turn his head left or right, look up, and handle/grasp things.  (Tr. 671–72).  He stated that Martin could rarely hold his head in a static position or finger with his left or right hands.  (*Id.*).  He stated that Martin could sit up to 45 minutes, walk up to 30 minutes, and stand up to 30 minutes at a time.  (Tr. 672).  In an 8-hour workday, Dr. Warren opined that Martin could sit for up to 4 hours and stand/walk for up to 2 hours.  (*Id.*).  He stated that Martin would need to take a 10-minute quiet sitting break every hour, and that he would be absent about three times per month. (*Id.*).

On March 3, 2014, Dr. Warren completed another medical source statement.  (Tr. 674–77).  Dr. Warren stated that Martin had multiple tender points, nonrestorative sleep, morning

sickness, and dry mouth symptoms related to his fibromyalgia. (Tr. 674). He also indicated that

Martin had headaches and pain in his lower and upper spine, chest, shoulders, hands/fingers, and

knees/ankles/feet. (Tr. 675). He indicated that Martin's symptoms were worse with changing

weather and static positioning. (*Id.*). He indicated that Martin could frequently carry up to 10

pounds, rarely carry up to 20 pounds, and never carry up to 50 pounds; occasionally look down

and turn his head right or left; rarely look up or hold his head in a static position; and rarely

handle, grasp, or finger anything with his hands. (Tr. 675–76). He opined that Martin could sit,

stand, and walk for no more than 15 minutes at a time and no more than 2 hours each in an

8-hour workday. (Tr. 676). He stated that Martin would need to lie down every 2 hours, and

that he would be absent from work four or more days per month. (*Id.*). On October 28, 2016,

Dr. Warren signed his March 3, 2014, medical source statement and wrote that Martin had the

"same symptoms and examination." (Tr. 1249–52).

### 3.    Treating Physician—Lawrence Monger, M.D.

In his treatment notes for November 20, 2015, Dr. Monger noted that Martin requested

that he "fill out forms for Lucas County job and family services . . . essentially wanting me to

state that he is currently unemployable." (Tr. 1150, 1154). Dr. Monger noted that he did not

have several of Martin's medical records, and that Martin had not followed through with his

referral to a cardiologist. (Tr. 1150–51, 1154–55). He stated that he had "no indication at this

point that [Martin] is unemployable. He does have medical conditions that require ongoing

treatment, but that should not preclude him from employment." (Tr. 1151, 1155). On November

30, 2015, Dr. Monger again stated that he did not believe Martin's medical conditions would

preclude him from employment, and noted that he did not have all of Martin's medical records.

(Tr. 1135).

16

### 4.    Consultative Examiner—Ryan Lakin, M.D.

On May 1, 2014, Ryan Lakin, M.D., conducted a consultative examination.  (Tr. 707–720).  Martin told Dr. Lakin that he could carry groceries, lift his 2-year-old10 times in an 8-hour day, cook, bathe, dress, drive, shop, clean, walk and shop without assistance, stand for 25 minutes, and climb 20 stairs.  (Tr. 707).  He also told Dr. Lakin that he could not sit through a movie, could only hold a child for 5 minutes at a time, and would drop objects frequently due to muscle spasms.  (*Id.*).  On examination, Dr. Lakin noted that Martin was alert, comfortable, and intelligent.  (Tr. 708).  Martin had normal range of motion, no noted joint issues, no spasms, and normal upper extremity pinch, grasp, and manipulation.  (Tr. 709).  He also had intact senses, no noted issues with walking, and no need for assistance walking.  (*Id.*).  Dr. Lakin determined that Martin was asymptomatic during the examination.  (Tr. 710).  He opined that Martin could lift up to 10 pounds frequently, up to 20 pounds occasionally, up to 50 pounds "occasionally to rarely based on symptoms," and never more than 50 pounds.  (Tr. 710, 715).  He stated that Martin could sit up to 6 hours per day with regular breaks, and he could stand and walk occasionally 2 hours per day with regular breaks.  (Tr. 710, 716).  Dr. Lakin indicated that Martin could never balance or climb ladders or scaffolds; however, Martin could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl.  (Tr. 718).  He indicated that Martin could never handle unprotected heights or extreme heat; occasionally handle moving mechanical parts, operating a motor vehicle, and vibrations; frequently handle extreme cold; and continuously handle humidity, wetness, dust, odors, fumes, and pulmonary irritants.  (Tr. 719).

### 5.    State Agency Consultants

On May 5, 2012, state agency consultant Dr. Gary Hinzman reviewed Martin's medical records and determined that the objective medical records did not show that Martin was disabled.  (Tr. 65–69, 73–77).  Dr. Hinzman opined that Martin could perform medium work, because he

could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, stand and walk for up to

6 hours in a workday, sit for up to 6 hours in a workday, and push or pull without limitation.

(Tr. 67, 75).  On October 29, 2012, Dr. Rachel Rosenfeld, M.D., considered additional medical

evidence and statements from Martin, and concurred with Dr. Hinzman's opinion.  (Tr. 86–91,

99–104).

### D.  Relevant Testimonial Evidence

Martin testified at the ALJ hearing.  (Tr. 772–812).  Martin stated that he was 32 years

old and lived with his parents and six-year-old son.  (Tr. 772).  He took care of his son 50% of

the time, and his son slept at his house every night.  (*Id.*).  He stated that he had a bachelor's

degree in biology with a minor in chemistry, and that he had not worked since December 15,

2010.  (Tr. 775–76).  Martin testified that he last worked as a team leader in the meat and

seafood department at a grocery store, and that he would lift up to 70 pounds.  (Tr. 777).  Before

that he worked as a retail clerk at another grocery store, and would lift up to 50 pounds.  (*Id.*).

He also worked for a year as a busser and dishwasher at a restaurant.  (*Id.*).

Martin stated that, in December 2010, his arms began feel numb, tingle, and hurt, and that

those issues progressed to his legs within a few months.  (Tr. 779).  He stated that he had more

frequent and worse headaches, which had become "almost constant" and occurred three to four

times a day.  (Tr. 779, 791, 807).  His treatment with Dr. Li and Dr. Elmer helped his migraines

and prevented them from becoming worse.  (Tr. 791–92).  He also had blurry vision and tunnel

vision at times, and sometimes his vision would black out.  (Tr. 779).  He had issues with his

shoulder and neck while working in the meat department.  (Tr. 781).  Martin stated that he had a

spinal tap in 2011, after which he had "some bad side effects."  (Tr. 781–82).  Martin went to get

a blood patch to treat his side effects from the spinal tap, but he then refused treatment and left

without signing discharge papers.  (Tr. 782–83).  Martin stated that he left because the doctor

was not there, and the hospital staff told him they were going to give him an IV drip and send

him home.  (Tr. 782).  Martin noted that he had nasal surgery in October 2012, which helped his

sleeping but did not help his migraines.  (Tr. 788–89).  He stated that his tremors had become

worse over time, but that a specialist told him he did not have Parkinson's.  (Tr. 790).  He stated

that he tested negative for multiple sclerosis and rheumatoid arthritis.  (*Id.*).  Martin stated that he

began seeing Dr. Monger after Dr. Rohrs retired, that Dr. Monger would just refer him to

specialists, and that the cardiologist Dr. Monger referred him to had a two-year waiting list.

(Tr. 793–94).  He said that Dr. Monger the referred him to another cardiologist, and he went to

see NP Karabin.  (Tr. 794–95).  Martin stated that cervical traction and water exercise therapy

gave him temporary relief, but did not have lasting effects in decreasing his pain or stiffness.

(Tr. 793–94, 799).  Trigger point injections also gave him temporary relief.  (Tr. 808–09).

Martin testified that his daily living activities had decreased since December 2010.

(Tr. 785).  Martin stated that he drove about twice a week, and he would go to the grocery store

or take his son to the park; however, his wrists would hurt if he drove longer than 15 minutes or

long distances.  (Tr. 774).  He stated that he stopped going out and seeing his friends, and that he

moved in with his parents in September 2012.  (Tr. 785–86).  He stated that, before he moved in

with his parents, his mother would help him with cleaning.  (Tr. 787).  He stated that, after he

moved in with his parents, he was "still able to accomplish [his] tasks," because he would spread

them out to avoid getting tired.  (*Id.*).  He stated that he had to take breaks when doing laundry or

writing on forms, because his wrists would hurt.  (Tr. 806).  He stated that he had no trouble

taking care of his son.  (Tr. 787–88).  He stated that he did his laundry and cooked, but that doing

laundry made him tired.  (Tr. 788).  He stated that, in a typical day, he would wake up around

6:30 a.m., lie in bed for up to 30 minutes, get up and get clothes for his son, make breakfast,

watch cartoons, walk his son around the corner to school, watch TV, clean, take a two-hour

afternoon nap, finish his cleaning chores, shower, walk to pick up his son, go over his son's homework, and play games with his son.  (Tr. 802–03).  He stated that he would lie on his bed while his son played with toys until it was time for him to cook dinner, and that sometimes he would ask his parents to pick up dinner.  (Tr. 803–04).  He stated that it was more comfortable for him to lie down when playing with his son because kneeling or sitting hurt his back and knees.  (Tr. 808).  After dinner, Martin showered and read books with his son, and his son would hold the book if it was heavier because Martin's hands would hurt.  (Tr. 805).  Martin stated that he woke up two or three times per month from pain and stiffness.  (Tr. 805).  In addition to his hearing testimony, Martin completed a function report on November 4, 2014, in which he stated that he could walk up to 3 blocks before he needed to stop and rest.  (Tr. 186).

Amy Kutschbach, a vocational expert ("VE"), also testified at the hearing.  (Tr. 812–820).  The ALJ asked the VE whether there were any jobs that a hypothetical individual with the same experience and age as Martin could perform if he had the residual functional capacity ("RFC") to perform light work, except that:

> he can occasionally use right and left hand and foot controls; he can reach, handle, finger, and feel with both upper extremities frequently, he can frequently balance, stoop, knee, crouch, and crawl; he can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and can occasionally balance. . . . He can never work around hazard[s] such as unprotected heights or moving mechanical parts; can occasionally operate a motor vehicle; and can occasionally work in conditions of humidity and wetness, extreme heat or cold, in conditions where there are vibrations, and in conditions where there's exposure to concentrated dust, odors, fumes, or other pulmonary irritants.

(Tr. 815).  The VE testified that such an individual would be able to perform Martin's past relevant work as a department manager and sales clerk, but not as a meat cutter, as those jobs are generally defined.  (Tr. 815–16).  He could not, however, perform Martin's past relevant work as Martin had performed it.  (Tr. 816).  The VE testified that such an individual could also work as a stock checker, office helper, and cashier.  (Tr. 816–17).  The ALJ asked the VE whether

20

Martin's past relevant work would be precluded if the hypothetical individual described above also needed to change positions between sitting and standing every 30 minutes, and she said that such work would be precluded.  (Tr. 816).  Such an individual could, however, work as a stock checker, office helper, and cashier.  (Tr. 817).  The VE testified that the above-described individual could still perform those jobs if he were also limited to occasional balancing, stooping, kneeling, crouching, and crawling.  (Tr. 817).  Such an individual would also be able to perform those jobs if he were additionally restricted to no exposure to humidity, wetness, heat/cold, vibrations, and concentrated pulmonary irritants.  (Tr. 817–18).

The ALJ asked the VE whether there were any jobs that could be performed by a hypothetical individual of Martin's age, education, and experience, if he were limited to sedentary work with the additional limitations described in the ALJ's first hypothetical question. (Tr. 818).  The VE testified that such an individual could work as an inspector, addresser, or assembler.  (Tr. 818).  The VE testified that such an individual could still perform those jobs if he were additionally limited to: (1) occasional balancing, stooping, kneeling, crouching, and crawling; and (2) no exposure to humidity, wetness, heat/cold, vibrations, and concentrated pulmonary irritants.  (Tr. 819).  The VE testified that all work would be precluded if the above-described individual needed to lie down during the course of the workday.  (Tr. 820).

## IV.    The ALJ's Decision

On December 23, 2016, the ALJ issued a decision determining that Martin was not disabled and denying his applications for disability insurance benefits and supplemental security income.  (Tr. 744–55).  The ALJ determined that Martin met the insured status requirements of the Social Security Act through December 31, 2016.  (Tr. 746).  The ALJ found that Martin had severe impairments: neurocardiogenic syncope, fibromyalgia, polyneuropathy, obesity, migraine headaches, osteoarthritis, and mild obstructive and restrictive ventricular defects.  (Tr. 746).  The

ALJ noted that, in determining whether Martin's fibromyalgia was a severe impairment, he had considered the entire record, including clinical statements ruling out other diagnoses and findings that he had multiple tender points, nonrestorative sleep, morning stiffness, and dry mouth and eye symptoms. (Tr. 747). He also noted that both treating physician Dr. Warren and consultative examiner Dr. Lakin diagnosed Martin with fibromyalgia. (*Id.*). The ALJ determined that Martin did not have an impairment, or combination of impairments, that met the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 748).

The ALJ determined that Martin had the RFC to perform sedentary work, but with the following restrictions:

> claimant can occasionally use right and left hand and foot controls. He can reach, handle, finger, and feel with both upper extremities frequently. He can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and can occasionally balance, stoop, kneel, crouch, or crawl. In addition, he can never work around hazards, such as unprotected heights, or around moving mechanical parts, can occasionally operate a motor vehicle. The claimant can never work in conditions of humidity and wetness, in extreme heat or cold, in conditions where there are vibrations, and in conditions where there is exposure to concentrated dust, odors, fumes, or other pulmonary irritants. He must also change positions every 30 minutes for 1-2 minutes in the immediate vicinity of the workstation.

(Tr. 749).

In assessing Martin's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 749). The ALJ stated that Martin's medically determinable impairments could reasonably be expected to cause his alleged symptoms; but he also found Martin's complaints regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 750). The ALJ stated that, although Martin's impairments would reasonably limit him to sedentary work with the additional restrictions noted in the RFC, the record did not support greater, work-preclusive limitations. (*Id.*). The ALJ specifically noted that Martin's subjective complaints were inconsistent with the generally unremarkable findings

22

throughout the record, including findings that Martin had stable joints, good-to-full range of motion, and full strength; Martin's statements that his injections provided him with some relief; and Martin's 2013 statement that he exercised 5 days per week. (Tr. 750–51). The ALJ also noted that Martin was "noncompliant on a couple of occasions," and gave the example of Martin refusing headache treatment and leaving the emergency room when staff would not give him a blood patch. (Tr. 750). The ALJ also considered the full extent of Martin's daily activities, including that he had to space out and limit his activities due to his symptoms, he did not drive often due to pain in his wrists, he needed to change positions frequently due to stiffness and pain in his back, his light housework caused severe pain in his hands, and his parents supported him. (Tr. 749–51).

The ALJ stated that he gave great weight to Dr. Monger's opinion—that Martin's symptoms should not preclude employment, even though he had conditions that required ongoing treatment—because it was consistent with the evidence as a whole. (Tr. 752). The ALJ explained that Dr. Rohrs opinion was due little weight because: (1) he made internally inconsistent statements that Martin was unemployable for six months, permanently disabled, and unemployable for ten months; (2) his physical examinations did not document disabling symptoms; and (3) the evidence as a whole contained unremarkable findings. (*Id.*). The ALJ also explained that Dr. Warren's opinion was given weight to the extent that he stated Martin's fibromyalgia diagnosis was consistent with the American College of Rheumatology's criteria for fibromyalgia; however, the functional limitations that Dr. Warren described were due "considerably less weight." (*Id.*). The ALJ explained that the functional limitations that Dr. Warren described were more extreme than those reflected by other record evidence, they were inconsistent with Martin receiving treatment only every three months, and they were inconsistent with notes stating that his symptoms were reduced with medicine. (Tr. 753). The

ALJ concluded that "the weight of the evidence as a whole, including the treatment record and opinion evidence consistent with the evidence as a whole supports the residual functional capacity assessment." (*Id.*).

Based on Martin's RFC, age, education, and experience, the ALJ determined that Martin was unable to perform any of his past relevant work, but that the Medical-Vocational Guidelines did not direct a finding of "not disabled." (Tr. 754). Thus, the ALJ relied on the VE's testimony to determine that Martin could perform a significant number of jobs. (Tr. 754–55). Such work included: assembler, address clerk, and inspector. (*Id.*). In light of his findings, the ALJ determined that Martin was not disabled from December 15, 2010, through the date of his decision and denied Martin's applications for disability insurance benefits and supplemental security income. (Tr. 755).

## V.    Law & Analysis

### A.    Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly

since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence.  *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error.  Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)).  Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

25

F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot

determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734,

2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,*

No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*,

No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an

accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to supplemental security income or disability benefits: (1) whether

the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a

severe impairment or combination of impairments; (3) if so, whether that impairment, or

combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P;

(4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if

not, whether, based on the claimant's age, education, and work experience, she can perform

other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and

416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  The

claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled

and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B.   Medical Opinion Evidence

Martin argues that the ALJ failed to apply proper legal standards in evaluating and giving

little weight to Dr. Warren's and Dr. Rohrs' opinions.  ECF Doc. 11, Page ID# 1321–28.  Martin

asserts that the ALJ failed to follow the regulations by omitting from his written decision any

discussion regarding the length of Dr. Warren's and Dr. Rohrs' treatment relationship with him,

or the impact of Dr. Warren's specialization.  *Id.* at 1324–1325.  Further, he contends that the

ALJ's reasons for giving little weight to Dr. Warren's and Dr. Rohrs' opinions—that they were inconsistent with the course of treatment, the reduction of his symptoms through medication, and the unremarkable examination findings in the record—were insufficient. *Id.* Martin also argues that the ALJ erroneously relied on Dr. Monger's opinion that his conditions should not preclude him from employment, because it was a statement on an issue reserved for the Commissioner. *Id.* at 1326–27. Moreover, Martin asserts that the ALJ should have treated Dr. Monger's opinion as a non-treating physician's opinion and given it less weight because Dr. Monger did not have all of Martin's records before him and rendered his first opinion before ever examining Martin. *Id.* at 1327–28.

The Commissioner responds that the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in weighing the medical opinion evidence. ECF Doc. 14, Page ID# 1344–47. The Commissioner asserts that the ALJ articulated good reasons for rejecting Dr. Rohrs' opinion by pointing to its internal inconsistency, its inconsistency with Dr. Rohrs' own treatment notes, and its lack of support in the other medical evidence. *Id.* at 1345. Similarly, the Commissioner argues that the ALJ articulated good reasons for rejecting Dr. Warren's opinion when he stated that the severe functional restrictions Dr. Warren described were inconsistent with Martin seeing him only every three months, the management of his symptoms through injections, and the other evidence in the record. *Id.* Furthermore, the Commissioner notes that the ALJ was not required to give an "exhaustive factor-by-factor analysis," and that the ALJ's decision made clear that he considered the length of Dr. Rohrs' treating relationship. *Id.* at 1346. Finally, the Commissioner contends that the ALJ could rely on Dr. Monger's opinion, even though Dr. Monger did not have access to all of Martin's records, because the ALJ had access to and considered the entire evidentiary record. *Id.*

27

Martin's reply brief reiterates his arguments that the ALJ failed to apply proper legal standards in weighing the medical opinion evidence. ECF Doc. 15, Page ID# 1351–56. Martin adds that the ALJ was not excused from discussing the regulatory factors, because the Commissioner did not claim that the ALJ met the regulations' procedural safeguards requiring the ALJ to articulate good reasons for rejecting a treating physician's opinion. *Id.* at 1354–56.

At Step Four, an ALJ must weigh every medical opinion that the SSA receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discounting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). If, for example, the physician's opinion "is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record," the ALJ should not give it controlling weight. SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017) (effective for cases filled on or after March 27, 2017); *see also* SSR 12-2p, 77 Fed. Reg. at 43641–42 (indicating that whether a physician's treatment notes are consistent with a diagnosis of fibromyalgia, and thus sufficient to establish a medically determinable impairment, may depend on whether the physician followed certain diagnostic criteria); *but cf. Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) ("Since the presence and severity of fibromyalgia cannot be confirmed by diagnostic testing, the physician's opinion must necessarily depend upon an assessment of the patient's subjective complaints.").

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  Nevertheless, nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations' procedural safeguard by stating good reasons for the weight given to the treating source's opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

A treating source's opinion on an issue reserved to the Commissioner, such as the ultimate issue of whether a claimant is disabled, is never assessed for controlling weight.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Nevertheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored."  SSR 96-5p, 61 Fed. Reg. 34471, 34472 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017) (effective for cases filed on or after March 27, 2017).  When such an opinion is in the record, the ALJ must determine the

29

extent to which that opinion is supported by other evidence in the record and apply the factors

for determining the weight due a non-controlling opinion. SSR 96-5p, 61 Fed. Reg. at 34472–73

(noting that such an opinion may be useful in evaluating a claimant's ability to function).

  An ALJ may rely on a physician's medical opinion, regardless of whether the physician

examined the claimant or merely reviewed then-existing medical records. *See McGrew v.*

*Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). If a physician's opinion is based on

outdated records, or the claimant's condition changed after the physician issued his opinion, an

ALJ may rely on that opinion so long as he considers all the medical evidence in the record. *Id.*

(holding that an ALJ could rely on a state agency consultant's opinion when he considered the

medical examinations that occurred after the consultant's assessment).

  The ALJ applied proper legal standards in weighing Dr. Rohrs', Dr. Warren's, and

Dr. Monger's opinions. The ALJ complied with the regulations by evaluating Dr. Rohrs',

Dr. Warren's, and Dr. Monger's opinions in light of the entire medical record, and clearly stating

the weight given to each of them. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R.

§§ 404.1527(c), 416.927(c); (Tr. 752–53). The ALJ also articulated good reasons for giving

little weight to Dr. Rohrs' and Dr. Warren's opinions and giving great weight to Dr. Monger's

opinion, when he explained that: (1) Dr. Monger's opinion was consistent with the evidence as a

whole; (2) Dr. Rohrs' opinion was internally inconsistent, inconsistent with his examination

findings, and inconsistent with other medical evidence; and that (3) Dr. Warren's opinion was

inconsistent with his own treatment notes, Martin's course of treatment, and other medical

evidence. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. §§ 404.1527(c),

416.927(c); (Tr. 752–53). That the ALJ did not explicitly discuss the length the physicians'

treatment relationships and specialization is of no moment here, because his explanation was

sufficiently clear to apprise a reviewing court of the reasons for the weight he gave to the

physicians' opinions.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; *Francis*, 414 F. App'x at 804–05; 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); (Tr. 752–53).  Further, the ALJ did not err in considering Dr. Monger's opinion, even assuming it reached an issue reserved to the Commissioner, because he did not give Dr. Monger's opinion controlling weight and weighed it based on its consistency with the evidence as a whole.  20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-5p, 61 Fed. Reg. at 34472–73; (Tr. 752).  Moreover, the unavailability of all of Martin's records at the time Dr. Monger issued his first opinion did not preclude the ALJ from relying upon it, because the ALJ considered all the evidence in the record.  *McGrew*, 343 F. App'x at 32; (Tr. 752).

To the extent that Martin argues the ALJ impermissibly rejected Dr. Rohrs' opinion based on the lack of objective medical findings supporting it, he appears to misinterpret SSR 12-2p.  ECF Doc.  *See* ECF Doc. 11, Page ID# 1325.  That ruling does not preclude an ALJ from considering whether a medical opinion is supported by objective medical findings, but merely provides the procedure for evaluating whether a claimant's fibromyalgia is disabling when there is no objective medical evidence.  *See* SSR 12-2p, 77 Fed. Reg. 49440–44.  Indeed, the ALJ was required to consider whether objective medical findings supported Dr. Rohrs' opinion.  *See* SSR 96-2p, 61 Fed. Reg. at 34491; SSR 12-2p, 77 Fed. Reg. at 49441–42.  Substantial evidence also supported the ALJ's decision to give Dr. Monger's opinion great weight, and Dr. Rohrs' and Dr. Warren's opinions little weight.  Evidence supported the reasons the ALJ gave for rejecting Dr. Rohrs' opinion, including: (1) the inconsistency between Dr. Rohrs' statements that Martin was permanently disabled, unemployable for 6 months, and unemployable for 10 months; (2) Dr. Rohrs' notes lacking findings that Martin was significantly limited and treating his conditions with medicine, diet, and exercise; and (3) Dr. Shah's, Dr. Platenberg's, Dr. Kaufman's, Dr. Asad's, and Dr. Buehler's unremarkable clinical findings;

(4) Dr. Sander's findings that Martin's symptoms were "mild to moderate"; and (5) Martin's, Dr. Rohrs, Dr. Elmer's, Dr. Gupta's, and Dr. Li's statements that his treatment through medications and physical therapy helped.  (Tr. 367, 369, 424, 431, 433, 506–09, 534–37, 549, 560, 581–82, 603, 607, 618–19, 625, 629, 652–55, 658, 662–69, 981, 985–1024, 1058, 1067, 1088–89, 1093–94).  Similarly, the significant limitations described in Dr. Warren's opinion were inconsistent with: (1) the unremarkable, mild, and moderate clinical findings by other providers discussed above; (2) Dr. Warren's notes that Martin's medications and physical therapy helped his symptoms; and (3) Dr. Warren's notes indicating that Martin had only a mildly limited to good range of motion, good muscle strength, and a normal gait.  (Tr. 367, 506–09, 534–37, 603, 607, 618–19, 625, 629, 655, 670–77, 981, 985–1024, 1058, 1067, 1088–89, 1093–94, 1227, 1230–31, 1236, 1240, 1249–52).  In contrast, Dr. Monger's opinion was consistent with evidence that Martin improved with medications and physical therapy, Dr. Monger's later examination showing no significant abnormalities in Martin's physical health, and that he retained the ability to engage several daily living activities notwithstanding the limitations imposed by his symptoms.  (Tr. 625, 629, 985–1024, 1088–89, 1093–94, 1050–51, 1054–55, 1058, 1067, 1125, 1131–40, 1231, 1236, 1240).  Thus, because the ALJ's reasons for the weight given to Dr. Rohrs', Dr. Warren's, and Dr. Monger's opinions could be reasonably drawn from the record, the ALJ's weight determinations were supported by substantial evidence. *Elam*, 348 F.3d at 125; *Rodgers*, 486 F.3d at 241.  Accordingly, even if evidence in the record could support a different result, the ALJ's weight determinations fall within the Commissioner's "zone of choice" and should not be overturned by this court.  *Elam*, 348 F.3d at 125; *Rodgers*, 486 F.3d at 241; *Jones*, 336 F.3d at 476; *Mullen*, 800 F.2d at 545.

C.      **Subjective Symptom Complaints**

Martin argues that substantial evidence did not support the ALJ's determination that his subjective symptom complaints regarding the limiting effects of his fibromyalgia were not consistent with the medical and other evidence in the record.  ECF Doc. 11, Page ID# 1328–31. He asserts that the ALJ improperly relied on the lack of objective medical evidence supporting his complaints, as objective medical evidence is often unavailable in fibromyalgia cases.  *Id.* at 1329–30.  Martin also contends that the ALJ also improperly relied on examinations showing that he had stable joints and full range of motion, because fibromyalgia patients often manifest normal muscle strength, neurological reactions, and full range of motion.  *Id.*  Furthermore, Martin argues that the ALJ overstated his treatment noncompliance, as: (1) the single occasion on which he refused treatment for his headaches, his headaches were caused by a miscommunication in a medical procedure; and (2) he failed to timely see a cardiologist only because Dr. Monger had made a specific referral to a cardiologist with a two-year waiting list. *Id.* at 1330–31.  Martin asserts that the record shows he was compliant with treatment and diligently followed recommendations, despite improving little.  *Id.* at 1331.

The Commissioner responds that the ALJ provided adequate reasons for discounting Martin's allegations of disabling pain and limitations, and that his decision was supported by substantial evidence.  ECF Doc. 14, Page ID# 1347–49.  The Commissioner argues that the ALJ properly relied on Martin's daily living activities and treatment history in rejecting Smith's subjective complaints.  *Id.* at 1347.  The Commissioner contends that substantial evidence supported the Commissioner's decision to discount Martin's complaints, because his ability to care for his six-year-old son, drive, do chores, and manage his pain through over-the-counter painkillers and trigger point injections was inconsistent with the alleged disabling effects.  *Id.* at 1347–48. Furthermore, the Commissioner asserts that Martin's noncompliance with treatment

also weighed against his subjective complaints. *Id.* at 1348. Finally, the Commissioner argues that, because substantial evidence supported the ALJ's decision to discount Martin's subjective complaints, this court should not disturb that decision. *Id.*

Martin replies that the ALJ improperly inflated Martin's daily living activities, and failed to consider the full scope of his limitations in performing them. ECF Doc. 15, Page ID# 1356–57. Further, Martin argues that, because the ALJ failed to apply the full test under 20 C.F.R. § 1529(c), and the majority of factors supported his complaints, substantial evidence does not support the ALJ's decision to discount his subjective complaints. *Id.* at 1357.

A claimant's "[s]ubjective complaints of pain or other symptoms may support a claim of disability." *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Generally, a claimant must show that: (1) there is evidence underlying medical condition that causes the allege symptoms; and (2) either (a) objective medical evidence confirms the severity of the alleged pain, or (b) the objectively determined medical condition is so severe that it can be reasonably expected to cause the alleged pain. *Id.* (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 10003 (6th Cir. 1988), and *Duncan v. Sec'y of Health & Hum. Servs*, 801 F.2d 847 (6th Cir. 1986)). When a claimant's pain is caused by fibromyalgia, however, this test is nearly impossible to meet due to the general lack of objective medical evidence. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("[W]e have recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs"); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d at 990 (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the severity of the alleged pain and diagnostic findings confirming the severity of the impairment almost never exist).

Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints. *See Jones*, 336 F.3d at 475–76. If objective medical evidence does not substantiate the alleged intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must look to the other evidence in the record. SSR 12-2p, 77 Fed. Reg. at 43643; *see also* SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and *the other evidence*." (emphasis added)). Such evidence includes the claimant's "daily activities, medications or other treatments . . . to alleviate symptoms, the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms." *Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 82 Fed. Reg. at 49465–66; *Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence when he determined that Martin's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. First, the ALJ applied proper legal procedures by assessing Martin's subjective symptom complaints based on their consistency with all the evidence in the record, and clearly articulating that Martin's subjective symptom complaints were not entirely consistent with that evidence. *Jones*, 336 F.3d at 475–76; SSR 12-2p, 77 F3d. Reg. at 43643; SSR 16-3p, 82 Fed. Reg. at 49465; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 749–51). Here, the ALJ did not impermissibly rely on the lack of objective evidence supporting Martin's

alleged limitations, but explicitly considered the entire record, including Martin's testimony regarding his daily activities, the adjustments he made to his activities to reduce his symptoms, and medical evidence regarding his retained abilities.  (Tr. 749–51).

Substantial evidence also supported the ALJ's determination that Martin's subjective symptom complaints were not entirely consistent with the other evidence in the record, as evidence in the record showed that Martin: (1) was able to manage his physical symptoms through medication and physical therapy; (2) retained the ability to walk up to three blocks, cook, clean, do laundry, and play with his son with certain adjustments for standing, sitting, and taking breaks; (3) retained a good range of motion and full muscle strength; and (4) had, at times, exercised five days per week.  *Rogers*, 486 F.3d at 241; (Tr. 65–69, 73–77, 86–91, 99–104, 186, 464–65, 482, 568–71, 603, 625, 627, 629, 707–10, 715–19, 774, 785–88, 802–06, 985–1024, 1039–45, 1058, 1067, 1076, 1079, 1082–84, 1093–94, 1116, 1121, 1208, 1211, 1224, 1227, 1230–31, 1235–36, 1240).  Furthermore, the ALJ controlled for the extent that Martin had to limit his daily living activities by restricting his RFC to sedentary work with additional limitations.  (Tr. 749, 785–88, 802–06).  Moreover, even if the ALJ "overstated" the level of Martin's noncompliance with treatment, the ALJ was nonetheless required to consider the fact that Martin had refused treatment on at least one occasion, as part of his duty to evaluate Martin's fibromyalgia based on all the evidence in the record.  SSR 12-2p, 77 F3d. Reg. at 43643; (Tr. 750); *see also* (Tr. 501–04, 529–32, 1150, 1154).  Thus, the ALJ properly determined that the medical and other evidence in the record did not confirm the alleged severity of Martin's symptoms, and this court may not disturb the ALJ's finding that Martin's subjective symptom complaints were not entirely consistent with the objective medical and other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F. 3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Blankenship*, 874 F.2d at 1123.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, I recommend that the Commissioner's final decision denying Martin's

application for disability insurance benefits and supplemental security income be AFFIRMED.

Dated: December 7, 2018

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).